# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CHRISTOPHER HERRERA, | ) |
| Plaintiff, | ) Civil Action No. 16-894 |
| v. | ) |
| | ) Judge Cathy Bissoon |
| COMMUNITY COLLEGE OF ALLEGHENY COUNTY, | ) |
| Defendant. | ) |

## MEMORANDUM ORDER

On January 4, 2017, and in advance of a Preliminary Injunction Hearing, the Court issued the following Order granting Defendant's Motion for Summary Judgment:

> The Court has opted to decide Defendant's Motion for Summary Judgment (Doc. 18) on the papers. Based on the Court's review of the parties' briefing and the record, summary judgment will be GRANTED for Defendant. An opinion will follow. The Court will not issue a Rule 58 Judgment closing the case until it issues its written opinion on the Motion for Summary Judgment. IT IS FURTHER ORDERED that Plaintiff's Motion for a Preliminary Injunction (Doc. 6) is DENIED. Accordingly, the Preliminary Injunction Hearing set for 1/6/17 is CANCELED.

(Doc. 26). What follows is the Court's opinion analyzing Defendant's Motion for Judgment.

## I. MEMORANDUM

Pending before the Court are Defendant Community College of Allegheny County ("Defendant" or "CCAC")'s Motion for Summary Judgment, and Plaintiff Christopher Herrera ("Plaintiff")'s Motion for a Preliminary Injunction. Plaintiff claims that Defendant discriminated against him on the basis of disability by refusing to allow him to participate in its remediation program after he failed to satisfy the school's academic requirements in violation of Section 504 of the Rehabilitation Act ("RA") and the Americans with Disabilities Act ("ADA"). Plaintiff

asks the Court to reverse the denial of his academic appeal and order his reinstatement to the school's Physical Therapy Assistant program. For the reasons that follow, Defendant's motion for summary judgment will be granted, and Plaintiff's motion for a preliminary injunction will be denied.

**BACKGROUND**

Plaintiff contends that he suffers from Attention Deficit Hyperactivity Disorder (ADHD). Plaintiff was first diagnosed with ADHD via a "computer test" conducted by Dr. Charles Bonner during his sophomore year of high school. (Doc. 20) at ¶ 19; (Doc. 23) at ¶ 19. At that time, Plaintiff was prescribed a 5 milligram dose of Adderall XR, which later increased to 30 milligrams several years ago. (Id.)

Plaintiff enrolled in CCAC in August 2009. (Doc. 20) at ¶ 18; (Doc. 23) at ¶18. On or about December 30, 2013, Plaintiff applied for the Physical Therapist Assistant ("PTA") Program, a program accredited through the Commission on Accreditation in Physical Therapy Education. (Doc. 20) at ¶¶ 11, 22; (Doc. 23) at ¶¶ 11, 22. Plaintiff was informed that he was not accepted into the PTA program because his "Total Admission Score (TAS) was lower than those of the applicants accepted into the PTA Program." (Doc. 20) at ¶ 22; (Doc. 23) at ¶ 22. Plaintiff, however, requested that CCAC place his application "on hold" if a space opened up. (Doc. 20) at ¶ 23; (Doc. 23) at ¶ 23. By letter dated May 16, 2014, Plaintiff was advised that he was conditionally accepted into the PTA Program for the fall 2014 semester. (Id.) The May 16, 2014 letter included information regarding the process for requesting for accommodations for students with a disability. (Doc. 20) at ¶ 24; (Doc. 23) at ¶ 24.

Plaintiff completed and signed a Student Contact Information Form on June 30, 2014. (Doc. 20) at ¶ 25; (Doc. 23) at ¶ 25. In it, he checked the "no" box to each of the following

questions: "3. Do you wish to inform program faculty and your clinical/fieldwork supervisor(s) of any pertinent condition(s)which may present issues in class, lab or at the clinical/fieldwork site?"; "4. Have you made contact with CCAC/Boyce Campus "Supportive Services for Students with Disabilities?"; and "5. If you answered yes, to Item #4, do you require any appropriate and reasonable accommodation?" (Id.) Plaintiff listed, however, that he took the following medication: "Adderall XR, 30 milligrams." (Doc. 20) at ¶ 26; (Doc. 23) at ¶ 26.

On September 25, 2014, Plaintiff completed and signed the "PTA Program Student Participation Contract." (Doc. 20) at ¶ 27; (Doc. 23) at ¶ 27. Plaintiff acknowledged that he reviewed the Physical Therapist Assistant Program Student Manual (Student Manual) on or before September 25, 2014. (Doc. 20) at ¶ 28; (Doc. 23) at ¶ 28. Section I of the Student Manual includes a PTA Program Comprehensive Examination Policy, PTA Program Progression Policy, PTA Program Remediation Process, and PTA Program Re-Application Process. (Doc. 20) at ¶ 29; (Doc. 23) at ¶ 29. The "PTA Program Comprehensive Examination Policy" states that a "passing score of 75% is required in order for the student to progress to the next semester of the PTA program." (Doc. 20) at ¶ 30; (Doc. 23) at ¶ 30. The "PTA Program Comprehensive Examination Policy" further states that "[s]tudents who do not pass with a 75% or higher are required to meet with the PTA program faculty." (Doc. 23) at ¶30. Finally, the "PTA Program Comprehensive Examination Policy" explains that students will not be permitted to progress if they do not meet minimal academic requirements that include: maintaining a 75% or better grade in all required courses; and achieving a 75% or better on the comprehensive exams. (Doc. 20) at ¶ 31; (Doc. 23) at ¶ 31. The "PTA Program Remediation Process" sets forth a five step procedure to be followed if "a student scores below the passing score on any test, assignment, or clinical." (Doc. 20) at ¶ 32; (Doc. 23) at ¶ 32. The "PTA Program Re-Application Process" sets

3

forth factors to be considered for students who re-apply and states that "[s]tudents may re-enter the PTA program once, and may repeat any major course only once." (Doc. 20) at ¶ 33; (Doc. 23) at ¶ 33. The "PTA Program Re-Application Process" also requires that the student "successfully complete PTA course examination with an 85% or higher to demonstrate subject matter competency." Section II of the Manual is entitled "Boyce Campus Allied Health Programs Policies & Guidelines." (Doc. 20) at ¶ 34; (Doc. 23) at ¶ 35. In Section II, students are informed that a student achieving less than a letter grade of "C" in a required course may repeat the course, however, "if the course is a prerequisite to subsequent courses in the program of study, they must re-apply to the program." (Doc. 20) at ¶ 35; (Doc. 23) at ¶36.

Between 2010 and December 2014, Plaintiff saw psychiatrist Joel Diamond every three months to monitor the adverse or potential adverse effects of Adderall. (Doc. 20) at ¶36; (Doc. 23) at ¶ 37. At some point in 2014, Plaintiff contacted CCAC's "Supportive Services for Students with Disabilities" regarding his ADHD, and someone at that office advised him to provide the school with a letter from his physician and a Verification of Disability form. (Doc. 20) at ¶ 37; (Doc. 23) at¶ 38. On January 26, 2015, Plaintiff submitted a letter from Dr. Diamond, dated December 12, 2014, which stated, in relevant part, that: "Christopher is diagnosed with Attention deficit disorder (ADHD), due to this condition Christopher may need additional time or assistance with his schooling." (Doc. 20) at ¶¶ 39, 44; (Doc. 23) at ¶¶ 40, 45. Plaintiff also submitted a Verification of Disability form, completed by Dr. Diamond, which indicated that Plaintiff was diagnosed "prior to being our patient, new to us in 2010." (Doc. 20) at ¶ 40; (Doc. 23) at ¶ 41. In response to a question about symptoms, functioning, treatment, severity of the disorder and expected prognosis, Dr. Diamond stated that Plaintiff's "ADHD is well treated w/ medication." (Doc. 20) at ¶ 41; (Doc. 23) at ¶ 42. In response to the remaining

4

questions, Dr. Diamond identified no functional limitations or necessary accommodations. (Doc. 20) at ¶ 42; (Doc. 23) at ¶ 43.

On February 3, 2015, Plaintiff received "Disability Certification for Faculty" forms from Supportive Services. (Doc. 20) at ¶ 46; (Doc. 23) at ¶ 47. To receive an accommodation, students must deliver these forms to the teaching faculty members who will provide the accommodation. (Doc. 20) at ¶ 47; (Doc. 23) at ¶ 48. Plaintiff submitted a form to his then-Professor and the Clinical Coordinator of Clinical Education in the PTA Program, Stephen W. Bannister, identifying the following accommodation: "EEX: Extended Time Exam." (Doc. 20) at ¶¶10, 46; (Doc. 23) at ¶¶10, 47. Plaintiff testified that he was given time and a half as an extended test time at CCAC after he sought this accommodation.[1] (Doc. 20) at ¶ 49; (Doc. 23) at ¶ 50.

On August 17, 2015, Plaintiff signed the Receipt of PTA 202 Course Outline and CCAC Student Handbook 2015-2016. (Doc. 20) at ¶ 56; (Doc. 23) at ¶ 56. The Receipt form signed by Plaintiff states, in relevant part, that "I understand that successful completion of PTA 202 requires that students must achieve a letter grade of "C" (75%) in PTA passing the Comprehensive Examination with a 75% or higher . . . If I do not achieve a letter grade of "C" (75%) or higher in PTA 202, I understand that I will be dismissed from the Physical Therapist Assistant Program…" (Doc. 20) at ¶ 57; (Doc. 23) at ¶ 57. On September 22, 2015, Plaintiff spoke with Dr. Bannister about his poor performance in the class. Thereafter, Plaintiff received a letter from Dr. Bannister listing a number of missing items from his student record, and

---

[1] Indeed, even though Plaintiff did not provide the Disability Certificates to his professors for the fall 2015 classes, he admits that he was afforded extended time on examinations during that semester. (Doc. 20) at ¶ 54; (Doc. 23) at ¶ 55.

5

recommending that Plaintiff follow up with CCAC's Early Intervention System due to his score of 76% on a PTA exam. (Doc. 20) at ¶ 58; (Doc. 23) at ¶ 58; (Doc. 21-2) at 54.

On September 29, 2015, Drs. Johnson and Bannister were advised that based on their referrals for early intervention, Supportive Services employee Edward Adams had contacted Plaintiff on September 28, 2015, via email and telephone, and suggested to Plaintiff that he use tutors and better utilize accommodations. (Doc. 20) at ¶ 59; (Doc. 23) at ¶ 59. Despite these suggestions, Plaintiff admitted to only attending one group tutoring session with Barb Scholle. (Doc. 20) at ¶ 60; (Doc. 23) at ¶ 60. Otherwise, Plaintiff studied with his mother at home and with study groups from school. (Doc. 20) at ¶ 61; (Doc. 23) at ¶ 61.

On October 29, 2015, Plaintiff again complete and signed the Student Contact Information Form. On this form, he checked the "yes" box to the question "3. Do you wish to inform program faculty and your clinical/fieldwork supervisor(s) of any pertinent condition(s) which may present issues in class, lab or at the clinical/fieldwork site?" and stated "A.D.D., however I won't let this affect my performance." (Doc. 20) at ¶ 68; (Doc. 23) at ¶ 68. Further, in response to question 5 on the form, "do you require any appropriate and reasonable accommodation?" Plaintiff requested "extended time for test." (Doc. 20) at ¶ 69; (Doc. 23) at ¶ 69). Plaintiff again was provided with the accommodations he requested. (Doc. 20) at ¶ 71; (Doc. 23) at ¶ 71. Additionally, although Plaintiff did not provide Dr. Bannister with prior notice for a separate testing space, Plaintiff was provided with a separate testing space for the December 1, 2015 PTA 202 Comprehensive Exam. (Doc. 20( at ¶¶70, 73; (Doc. 23) at ¶¶ 70, 73. On December 3, 2015, Plaintiff received a letter from Norman L. Johnson, the PTA Program Director, stating that he received a 71% on his PTA 202 Comprehensive Examination, below the required 75% threshold. (Doc. 20) at ¶ 79; (Doc. 23) at ¶ 80. The December 3, 2015 letter

recommended that Plaintiff contact CCAC's Boyce Campus counselors or meet with his Academic Advisor; however, Plaintiff contends that he did not do so because he wanted to pursue the remediation process. (Doc. 20) at ¶ 80; (Doc. 23) at ¶ 81.

On December 3, 2015, Plaintiff met with Drs. Johnson and Bannister, where they discussed Plaintiff reapplying for the program. (Doc. 20) at ¶ 81; (Doc. 23) at ¶ 82. Plaintiff testified that he was discouraged from reapplying and was asked if there are any other careers he might be interested in.[2] (Doc. 23) at ¶ 82. Plaintiff also testified that Dr. Johnson stated during that meeting: "I wanted to play for the NFL, but that is not happening either." (Doc. 21-1) at 32:15-16. On December 10, 2015, Plaintiff again met with Dr. Bannister. (Doc. 20) at ¶ 83; (Doc. 23) at ¶ 84. During that meeting, Dr. Bannister noted that Plaintiff failed to complete one of the assigned quizzes in Blackboard. (Doc. 20) at ¶ 86; (Doc. 23) at ¶ 87. Additionally, Dr. Bannister reviewed his grades for accuracy. (Doc. 20) at ¶ 87; (Doc. 23) at ¶ 89. Among other things, Plaintiff agreed with notations in his student record that he: (a) participated in only five of 11 scheduled proctored test reviews; (b) did not follow up on the recommendations for Perkins tutoring for both PTA 201 and PTA 202; and (c) did not participate in any summer open labs. (Doc. 20) at ¶ 84; (Doc. 23) at ¶ 85. However, Plaintiff testified that he participated in more than six in-semester open labs but was not aware of a sign-in sheet during the last semester. (Doc. 20) at ¶ 85; (Doc. 23) at ¶ 86.

On December 10, 2015, Plaintiff sent an email to Dr. Johnson stating: "I just wanted to schedule a remediation meeting to figure out what to do from here." (Doc. 20) at ¶ 88; (Doc. 23) at ¶ 90. Dr. Johnson's response was: "Good afternoon. When Dr. Bannister and I met with you on 12/3, I recommended that you meet with an Academic Advisor to investigate what courses

---

[2] Plaintiff claims that he is aware of two students who reapplied and/or reentered the program. (Doc. 20) at ¶ 82; (Doc. 23) at ¶ 83.

7

you would need to complete to earn a General Studies degree from CCAC. Did you meet with an Academic Advisor? If not, please do so. I am available to meet on Tuesday, 12/15 at 10:30 a.m." (Doc. 20) at ¶ 89; (Doc. 23) at ¶ 91. Plaintiff responded: "Thank you. I appreciate your input and am currently considering my options. I do not want to abandon this program and would like to know what steps I need to take to continue. Thank you again." (Doc. 20) at ¶ 90; (Doc. 23) at ¶ 92.

On December 15, 2015, Plaintiff met with Dr. Lillian Briola, ALH Department Head Boyce Campus. (Doc. 20) at ¶ 92; (Doc. 23) at ¶ 94. On December 17, 2015, Plaintiff filed an academic complaint under CCAC's Student Academic Complaint Procedure, which stated in part: "I have a learning disability which is on record with CCAC. I do not feel that the program offered me any assistance to accommodate my disability other than more time on tests and a separate room for the comp exam." (Doc. 20) at ¶ 93; (Doc. 23) at ¶ 95. Plaintiff met with Dr. Tomi Waters, Associate Dean of Academic Affairs on December 22, 2015. (Doc. 20) at ¶ 95; (Doc. 23) at ¶ 97. Dr. Waters issued a decision by letter on January 4, 2016, wherein she noted that Plaintiff was "given the accommodations for this test that you had requested when you registered with this office at the beginning of the semester" and that he "did not participate in any of the academic remediation activities that were recommended to you by the PTA Program, including PTA study groups, Perkins tutoring, or other tutoring services." (Doc. 20) at ¶ 96; (Doc. 23) at ¶ 98. In her January 4 determination letter, Dr. Waters also stated that the "D" grades in PTA 202 and PTA 201 "preclude you from moving forward in the PTA Program, per the Allied Health Program guidelines." (Doc. 20) at ¶ 97; (Doc. 23) at ¶ 99.

Plaintiff and his mother met with Richard Allison, Dean of Academic Affairs, on January 25, 2016. (Doc. 20) at ¶ 98; (Doc. 23) at ¶ 100. On January 29, 2016, Dean Allison issued a

letter upholding Dr. Waters's decision.  (Doc. 20) at ¶ 99; (Doc. 23) at ¶ 101.  Since receiving Dean Allison's January 29, 2016 letter, Plaintiff has had no further communications with anyone who is a part of the Physical Therapy Assistant program at CCAC.  (Doc. 20) at ¶ 100; (Doc. 23) at ¶ 102.  Plaintiff has not reapplied to the PTA program.  (Doc. 20) at ¶ 101; (Doc. 23) at ¶ 103.

**ANALYSIS**

Plaintiff alleges that Defendant discriminated against him on the basis of his disability in violation of the RA and the ADA by refusing to allow him to participate in the PTA Program Remediation Process.  Both the RA and the ADA bar an entity that receives federal funding, such as CCAC, from discriminating against an individual on account of that individual's disability.  See McDonald v. Pennsylvania, 62 F.3d 92, 95 (3d Cir. 1995).  The standards for determining a violation of the RA are the same as those under the ADA.  See Chisolm v. McManimon, 275 F.3d 315, 324 n.9 (3d Cir. 2001).  Accordingly, the Court "confine[s] [its] discussion to the ADA with the understanding that the principles will apply equally to the Rehabilitation Act . . .." Id.; see also S.H. ex rel. Durrell v. Lower Merion School Dist., 729 F.3d 248, 260 (3d Cir. 2013) ("The same standards govern both the RA and the ADA claims."); Chambers ex rel. Chambers v. Sch. Dist. of Phila. Bd of Edu., 587 F.3d 176, 189 (3d Cir. 2009).

To state a claim for disability discrimination under the ADA, "[p]laintiffs must show that: (1) they are handicapped or disabled as defined under the statutes; (2) they are otherwise qualified to participate in the program at issue; and (3) they were precluded from participating in a program or receiving a service or benefit because of their disability." CG v. Pennsylvania Dep't of Educ., 734 F.3d 229, 235 (3d Cir. 2013) (citing Chambers ex rel. Chambers, 587 F.3d at 189).  Plaintiff indisputably meets the first prong of this test:  he has submitted that he suffers from ADHD, a recognized disability under the ADA and RA.  See C.H. v. Cape Henlopen Sch.

9

Dist., 606 F.3d 59, 62 (3d Cir. 2010). Defendant argues, however, that Plaintiff has not met the second and third prongs of the test. The Court agrees.

First, Plaintiff has not met his *prima facie* burden of showing that he is "otherwise qualified" to remain in the PTA program. "An otherwise qualified individual is a person who can meet all of a program's requirements in spite of a disability, with or without reasonable accommodation." Millington v. Temple Univ. Sch. of Dentistry, 261 Fed. Appx. 363, 366 (3d Cir. Jan. 23, 2008) (unpublished) (citing Southeastern Comm. Coll. v. Davis, 442 U.S. 397, 406 (1979) and McDonald v. Pennsylvania, 62 F.3d 92, 96 (3d Cir. 1995)).[3]

Here, Plaintiff plainly did not meet the academic standards required by the program as he failed to achieve the required score of 75% in PTA 201 and PTA 202. Plaintiff seems to argue that he did not meet these standards due to his disability. However, the undisputed evidence demonstrates that Plaintiff did not meet the academic requirements of the program *even after* CCAC provided him with all requested accommodations, including extended time to complete exams and a separate testing area. (Doc. 20) at ¶¶ 70, 71, 73; (Doc. 23) at ¶¶ 70, 71, 73. Furthermore, Defendants have presented substantial evidence that Plaintiff did not fully utilize the remedial resources available to him for reasons unrelated to his identified disability. For example, he ignored recommendations for tutoring, did not attend any summer labs and participated in less than half of the 11 test reviews. (Doc. 20) at ¶¶ 84, 85; (Doc. 23) at ¶¶ 85, 86.

---

[3] Plaintiff argues that the definition of an "otherwise qualified individual" set out in Millington is inapt, since Millington was not a disparate treatment but rather a reasonable accommodations case. However, Millington's definition of an "otherwise qualified individual" under the ADA fully comports with the standard used by Court of Appeals for the Third Circuit in disparate treatment cases. See, e.g., Shaner v. Synthes, 204 F.3d 494, 500 (3d Cir. 2000) (in order to establish a prima facie case of disparate treatment under the ADA, a plaintiff must show, *inter ali*a, that he is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer).

Plaintiff cites North v. Widener University, 69 F. Supp.2d 630 (E.D. Pa. 2012), to support his position that he was "otherwise qualified" to participate in the academic program. (Doc. 22) at 6. Plaintiff's reliance on North v. Widener University is misplaced. There, the court found that a plaintiff with a disability who was dismissed from a Doctorate of Psychology Program was "otherwise qualified" because "when plaintiff was expelled in the Fall of 2011, he was in good academic standing. If his retake exam had been one point higher, no grounds would exist for expulsion." 69 F. Supp.2d at 633. Here, in contrast, Plaintiff was not in good academic standing when he was dismissed from the PTA program. To the contrary, as noted, he failed to satisfy the academic requirements of the program, despite receiving various accommodations from CCAC, as well as recommendations concerning how he could improve his academic performance.

Furthermore, even if Plaintiff can show that he was an "otherwise qualified individual," his RA and ADA claims still fail because he has adduced no evidence of discrimination. Plaintiff first argues that there is an inference of discrimination in this case because he "was explicitly informed, during discussions with Dr. Johnson about his grades, of other students who had been allowed to progress despite grades lower than 75% on the Comprehensive Examination." (Doc. 22 at 9) (citing Doc. 21 at 85:18-24). Plaintiff argues that "[g]iven that the remediation process was available to typically-developing PTA students, and that Plaintiff was not provided with the benefit of the remediation process, this denial gives rise to the inference of disability-based discrimination." (Doc. 22 at 10). The Court agrees that, typically, an inference of discrimination may arise when "similarly situated persons not within the protected class were treated more favorably [than plaintiff]." Sarullo v. U.S. Postal Serv., 352 F.3d 789, 798 n. 7 (3d Cir.2003). Here, however, despite having had ample opportunity to conduct discovery on this issue, Plaintiff has submitted no record evidence that any "typically-developing" student was

allowed to progress in the program under similar circumstances to Plaintiff's. Because Plaintiff fails to identify these alleged "comparators," the Court has no basis to determine whether they are, in fact, similarly situated to Plaintiff (*e.g.*, whether they took the same classes, received similar exam scores, participated in the same amount of tutoring, etc.). See Monaco v. Am. Gen. Assurance Co., 359 F.3d 296, 305 (3d Cir. 2004) (the analysis of whether someone is similarly situated to the plaintiff "requires the court to undertake a fact-intensive inquiry on a case-by-case basis"). Because Plaintiff has not provided the Court with anything more than mere conjecture, the Court is unable to draw the inference that Plaintiff was treated unfavorably on the basis of his disability. Likewise, the Court disagrees with Plaintiff's claim that Dr. Johnson's alleged comment that "he wanted to play in the NFL, but that wasn't going happen either" is evidence of discrimination. (Doc. 21) at 32:13-16. This comment, which does not in any way reference Plaintiff's ADHD or any other disability, cannot form the basis of a disability discrimination claim. See Williams–McCoy v. Starz Encore Grp., 2004 WL 356198, at *8 (E.D. Pa. Feb.5, 2004) (no evidence of unlawful racial discrimination where "not one single race-based comment is alleged and there is no logical inference that the comments were, in fact, race-based").

Because Plaintiff has failed to adduce any evidence to establish a *prima facie* claim of disability discrimination, the Court will grant Defendant's Motion for Summary Judgment, and deny Plaintiff's Motion for a Preliminary Injunction.

## II. ORDER

Consistent with the Court's January 4, 2017 Order (Doc. 26) and for the reasons stated above, the Court hereby GRANTS Defendant's Motion for Summary Judgment and DENIES

Plaintiff's Motion for a Preliminary Injunction.  A separate Judgment Order pursuant to Federal Rule of Civil Procedure 58 will follow.

June 29, 2017

                                                 <u>s/Cathy Bissoon</u>
                                                 Cathy Bissoon
                                                 United States District Judge

cc (via ECF email notification):

All counsel of record.